1

2

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

3

4   **DAMARIS ACEVEDO-TORRES,**

5   **Plaintiff,**

6   **v.**                                                      **CIVIL NO. 11-2195 (GAG)**

7   **MUNICIPALITY OF ARECIBO, et al.,**

8   **Defendants.**

9                                              **OPINION AND ORDER**

10         On December 14, 2011, Damaris Acevedo-Torres ("Plaintiff") filed this action against the

11   Municipality of Arecibo ("Defendant"), alleging sexual harassment and retaliation in violation of

12   Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and Puerto Rico

13   Law 100 of June 30, 1959 ("Law 100"), P.R. LAWS ANN. tit. 29, §§ 146 *et seq.*  The court previously

14   granted in part and denied in part Defendant's motion to dismiss (Docket No. 20.)  All that remains

15   before the court is Plaintiff's Title VII hostile work environment claim.

16         Presently before the court is Defendant's motion for summary judgment (Docket No. 35).

17   Plaintiff opposed the motion (Docket No. 41) and Defendant replied (Docket No. 49).  After

18   reviewing these submissions and the pertinent law, the court **GRANTS** Defendant's motion for

19   summary judgment at Docket No. 35.

20   **I.    Standard of Review**

21         Summary judgment is appropriate when "the pleadings, depositions, answers to

22   interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

23   genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

24   of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  See FED. R. CIV. P. 56(a).  "An issue

25   is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it

26   'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'"  Iverson

27   v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).

28   The moving party bears the initial burden of demonstrating the lack of evidence to support the non-

**Civil No. 11-2195 (GAG)**

1   moving party's case. Celotex, 477 U.S. at 325. "The movant must aver an absence of evidence to

2   support the nonmoving party's case. The burden then shifts to the nonmovant to establish the

3   existence of at least one fact issue which is both genuine and material." Maldonado-Denis v.

4   Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994). The nonmovant may establish a fact is

5   genuinely in dispute by citing particular evidence in the record or showing that either the materials

6   cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse

7   party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). If the

8   court finds that some genuine factual issue remains, the resolution of which could affect the outcome

9   of the case, then the court must deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477

10  U.S. 242, 248 (1986).

11          When considering a motion for summary judgment, the court must view the evidence in the

12  light most favorable to the non-moving party and give that party the benefit of any and all reasonable

13  inferences. Id. at 255. Moreover, at the summary judgment stage, the court does not make

14  credibility determinations or weigh the evidence. Id. Summary judgment may be appropriate,

15  however, if the non-moving party's case rests merely upon "conclusory allegations, improbable

16  inferences, and unsupported speculation." Forestier Fradera v. Mun. of Mayaguez, 440 F.3d 17, 21

17  (1st Cir. 2006) (quoting Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

18  **II.      Relevant Factual Background**

19          Plaintiff attempted to become a policewoman in Arecibo for three years prior to her

20  acceptance at the police academy in 2007. (See Docket Nos. 33 ¶¶ 1-2; 44 ¶¶ 1-2.) Plaintiff became

21  a cadet on August 10, 2007, and completed the academy on February 16, 2008. (See Docket Nos.

22  33 ¶¶ 7-8; 44 ¶¶ 7-8.) After serving a probationary period, Plaintiff became a career employee with

23  Defendant. (See Docket Nos. 33 ¶ 9; 44 ¶ 9.)

24          **A.      Plaintiff's Relationship with Jose Martinez Vargas**

25          While Plaintiff and Jose Martinez Vargas ("Martinez Vargas") attended the academy

26  together, they did not spend much time together. (See Docket Nos. 33 ¶¶ 23-24; 44 ¶¶ 23-24.) They

27

28                                                   2

Civil No. 11-2195 (GAG)

1  maintained different patrol shifts and did not spend time with each other outside of work.  (See
2  Docket Nos. 33 ¶¶ 25-27; 44 ¶¶ 25-27.)  No romantic relationship existed between the two.  (See
3  Docket Nos. 33 ¶ 28; 44 ¶ 28.)  On roughly two occasions, Plaintiff covered patrol duty with
4  Martinez Vargas without incident.  (See Docket Nos. 33 ¶¶ 29-30; 44 ¶¶ 29-30.)  During those
5  occasions, Martinez Vargas did not discuss his personal life or topics outside the scope of their
6  employment.  (See Docket Nos. 33 ¶ 31; 44 ¶ 31.)

7      **B.    The March 11, 2010 Incident[1]**

8      Plaintiff was regularly assigned the watch duty of the Arecibo Coliseum ("Coliseum") and
9  estimates that she spent half her time on that duty (or similar watch duty) and half at the front desk
10  at the precinct.  (See Docket Nos. 33 ¶¶ 32-34; 44 ¶¶ 32-34.)  Plaintiff always performed the watch
11  duty by herself as it was a single-person task.  (See Docket Nos. 33 ¶ 35; 44 ¶ 35.)  When covering
12  the Coliseum, Plaintiff would leave her belongings inside the ticket office, which had a heavy
13  industrial door that could not be fully closed.  (See Docket Nos. 33 ¶¶ 37-38; 44 ¶¶ 37-38.)  Plaintiff
14  would begin her shift at 4:00 AM, sign in at headquarters and then receive her assignment for the
15  day.  (See Docket Nos. 33 ¶ 39-41; 44 ¶ 39-41.)  A few weeks before March 11, 2010, while off
16  duty, Martinez Vargas showed up at the Coliseum requesting to use the bathroom.  (See Docket No.
17  39-1 at 22.)  Plaintiff allowed Martinez Vargas to use the bathroom, but they did not discuss much
18  else because Plaintiff was busy.  (See id. at 22-23.)  Even though Plaintiff thought Martinez Vargas'
19  visit was strange, she did not inform her supervisors.  (See Docket Nos. 33 ¶ 49; 44 ¶ 49.)

20      On March 11, 2010, Plaintiff was again assigned the Coliseum duty and stopped at a gas
21  station to purchase a newspaper and hot chocolate before proceeding to the Coliseum.  (See Docket
22
23
24      [1] The only parties to this case are Damaris Acevedo-Torres and the City of Arecibo.  Jose
    Martinez Vargas is not a party to this action.  The court notes Martinez Vargas' version of the
25  subsequent events deviates significantly from both Plaintiff's and Defendant's versions of the events,
    exemplified by his  responses to the administrative investigation.  (See Docket No. 39-13.)  For the
26  purposes of the present action, the uncontested facts as agreed upon between Plaintiff and Defendant
27  shall govern.

28                                                  3

**Civil No. 11-2195 (GAG)**

Nos. 33 ¶¶ 42-43; 44 ¶¶ 42-43.)  While at the gas station, Martinez Vargas call Plaintiff and inquired whether Plaintiff would be on the Coliseum duty that day and whether he could meet her there.  (See Docket Nos. 33 ¶ 44; 44 ¶ 44.)  Even though Martinez Vargas was off duty, he was waiting for Plaintiff, who arrived around 4:20 AM.  (See Docket Nos. 33 ¶¶ 45, 50-51; 44 ¶¶ 45, 50-51.)  Martinez Vargas was still wearing his uniform from his previous shift and engaged Plaintiff in a conversation related to police business.  (See Docket Nos. 33 ¶¶ 52-53; 44 ¶¶ 52-53.)  Plaintiff and Martinez Vargas stood roughly five feet apart when Plaintiff realized Martinez Vargas was touching his genitals over his uniform pants.  (See Docket Nos. 33 ¶¶ 54-55; 44 ¶¶ 54-55.)  When Plaintiff expressed her surprise at his actions, Martinez Vargas responded, "[t]he thing is that I'm very horny."  (See Docket Nos. 33 ¶ 56; 44 ¶ 56; 39-1 at 29.)  When Plaintiff asked Martinez Vargas if he was married, he responded that he was having difficulties with his marriage and stopped touching himself.  (See Docket Nos. 33 ¶ 57; 44 ¶ 57.)  Thereafter, Martinez Vargas told Plaintiff he was going back to his car to change because his pants were uncomfortable.  (See Docket Nos. 33 ¶ 58; 44 ¶ 58.)

Upon his return, Martinez Vargas was wearing an eclectic ensemble consisting of his uniform shirt and jacket, basketball shorts, socks, but no shoes.  (See Docket Nos. 33 ¶ 59; 44 ¶ 59; 39-1 at 31.)  Of importance, Martinez Vargas carried no weapons on his person at this time.  (See Docket Nos. 33 ¶ 60; 44 ¶ 60.)  The two were discussing Martinez Vargas' personal problems when Plaintiff again noticed Martinez Vargas was touching himself; however, this time his genitals were exposed.  (See Docket Nos. 33 ¶¶ 61-62; 44 ¶¶ 61-62.)  Martinez Vargas stroked his penis, as if masturbating in order to obtain an erection.  (See Docket Nos. 33 ¶ 63; 44 ¶ 63.)  Plaintiff yelled at Martinez Vargas, telling him to go home and take care of that.  (See Docket Nos. 33 ¶ 64; 44 ¶ 64; 39-12 at 2.)  Instead, Martinez Vargas asked Plaintiff if he could masturbate in front of her.  (See Docket Nos. 33 ¶ 64; 44 ¶ 64.)

Plaintiff ran to the ticket office where she attempted to close the door.  (See Docket Nos. 33 ¶ 67; 44 ¶ 67.)  Unperturbed by Plaintiff's previous rebuttal, Martinez Vargas followed Plaintiff to

**Civil No. 11-2195 (GAG)**

1
2
3
4
5
6

the ticket office door and, through the crack of the unclosed door, asked Plaintiff, "Did you take a good look at it?  What do you think?  Is it long?  Is it big?"  (See Docket No. 39-1 at 33.)  When Plaintiff pleaded for Martinez Vargas to leave once more, he did.  (See Docket Nos. 33 ¶ 71; 44 ¶ 71.)  At no point did Martinez Vargas attempt to open the ticket office door.  (See Docket Nos. 33 ¶ 72; 44 ¶ 72.)  Plaintiff viewed Martinez Vargas' penis for three to four seconds.  (See Docket Nos. 33 ¶ 66; 44 ¶ 66.)

7
8
9
10
11

As Martinez Vargas left, Sergeant Avila ("Avila") entered the area with his patrol car, as previously arranged between Avila and Plaintiff.  (See Docket Nos. 33 ¶ 73; 44 ¶ 73.)  Before leaving, Martinez Vargas spoke with Avila for several minutes.  (See Docket Nos. 33 ¶ 75; 44 ¶ 75.)  Plaintiff felt safe with Avila at the scene and exited the ticket office when he arrived, but she did not inform Avila of the incident.  (See Docket Nos. 33 ¶ 77; 44 ¶ 77.)

12
13
14
15
16

Martinez Vargas did not ask, attempt, or force Plaintiff to have sex with him, touch or attempt to touch Plaintiff, or grab or struggle with Plaintiff.  (See Docket Nos. 33 ¶¶ 79-81; 44 ¶¶ 79-81.)  Plaintiff did not think Martinez Vargas wanted to have sex with her.  (See Docket Nos. 33 ¶ 68; 44 ¶ 68.)  The parties agree Martinez Vargas propositioned Plaintiff to masturbate in front of her.  (See Docket Nos. 33 ¶¶ 82-83; 44 ¶¶ 82-83.)

17

**C.     The Aftermath**

18
19
20
21
22
23
24
25
26
27

At about 8:00 AM, Plaintiff went to headquarters to drop off her car before returning to the Coliseum.  (See Docket Nos. 33 ¶ 85; 44 ¶ 85.)  She remained at the Coliseum until Officers Javier Casablanca ("Casablanca") and Jaime Reyes ("Reyes") picked her up in order to perform her patrol duties.  (See Docket Nos. 33 ¶¶ 86-87; 44 ¶¶ 86-87.)  While riding in the patrol car, Plaintiff phoned Nancy Candelaria ("Candelaria"), a fellow policewoman who attended the same academy as Plaintiff and Martinez Vargas.  (See Docket Nos. 33 ¶¶ 88-90; 44 ¶¶ 88-90.)  Unwilling to detail the story in front of her fellow officers, Plaintiff simply stated that something disgusting had happened.  (See Docket Nos. 33 ¶ 91; 44 ¶ 91.)  Candelaria asked Plaintiff if it had anything to do with a fellow policeman and asked multiple questions attempting to ascertain the perpetrator's identity.  (See Docket Nos. 33 ¶¶ 92-93; 44 ¶¶ 92-93.)  After the game of Guess Who had finished, Candelaria told

28

5

**Civil No. 11-2195 (GAG)**

Plaintiff she needed to go to headquarters for an in-person discussion. (See Docket Nos. 33 ¶ 94; 44 ¶ 94.) Casablanca and Reyes both asked Plaintiff what had happened, and although Plaintiff was reluctant at first, she eventually detailed the account and asked the officers to remain silent. (See Docket Nos. 33 ¶¶ 95-96; 44 ¶¶ 95-96.)

Upon returning to headquarters, Casablanca and Reyes told Avila the details anyway. (See Docket Nos. 33 ¶ 97; 44 ¶ 97.) While sitting at headquarters, waiting for her shift to end, Plaintiff broke down crying and excused herself to the restroom. (See Docket Nos. 33 ¶¶ 98-99; 44 ¶¶ 98-99.) Plaintiff was taken to a meeting room with a number of officers, including Avila, Casablanca and Reyes. (See Docket Nos. 33 ¶ 101; 44 ¶ 101.) After recounting her story, the Chief of Field Operations stated, "this could not stay like that," and placed a call to the state police to file a complaint. (See Docket Nos. 33 ¶ 102-103; 44 ¶ 102-103.) Plaintiff was stripped of her weapon, gave a statement and a complaint was immediately filed with the district attorney's office. (See Docket Nos. 33 ¶ 104; 44 ¶ 104.) Plaintiff was stripped of her weapon because she was to receive treatment at the Worker's Compensation Fund and would not be allowed to bear a weapon during the treatment. (See Docket Nos. 33 ¶ 105; 44 ¶ 105.) Likewise, Martinez Vargas was stripped of his weapon. (See Docket Nos. 33 ¶ 106; 44 ¶ 106.)

Agent Irma Rios ("Rios") of the state police force, along with her partner, met Plaintiff at headquarters to discuss the case. (See Docket Nos. 33 ¶ 107; 44 ¶ 107.) Plaintiff recounted the story and submitted a statement to the Puerto Rico Department of Justice. (See Docket Nos. 33 ¶¶ 107, 109-110; 44 ¶¶ 107, 109-110.) Candelaria accompanied Plaintiff to provide support. (See Docket Nos. 33 ¶ 111; 44 ¶ 111.)

Probable cause was found against Martinez Vargas on the same day as the events and the trial was set for April 23, 2010. (See Docket Nos. 33 ¶ 112; 44 ¶ 112.) On March 16, 2010, Martinez Vargas was summarily suspended while the investigation continued. (See Docket No. 33 ¶ 115; 44 ¶ 115.) Martinez Vargas gave a statement in his defense during the investigation. (See Docket No. 39-13.) Plaintiff appeared at the criminal trial against Martinez Vargas. (See Docket Nos. 33 ¶¶ 113-114; 44 ¶¶ 113-114.) On October 7, 2010, Defendant filed administrative charges against

**Civil No. 11-2195 (GAG)**

1
2
3

Martinez Vargas and advised him of its intention to terminate his employment, which it did on April 6, 2011. (See Docket No. 33 ¶¶ 117-118; 44 ¶¶ 117-118.) Martinez Vargas' expulsion from service was effective April 15, 2011.

4

### D.    Prior Incidents Involving Martinez Vargas

5
6
7
8
9
10
11
12
13
14
15

After the incident, Plaintiff asked Candelaria how she guessed Martinez Vargas was the perpetrator so quickly. (See Docket Nos. 33 ¶ 123; 44 ¶ 123.) Candelaria responded that another female officer had endured similar treatment. (See id.) In addition to Plaintiff, the investigation revealed that Martinez Vargas treated four other women similarly. (See Docket Nos. 33 ¶ 121; 44 ¶ 121.) Two of the women refused to cooperate in this case because they did not want to be involved. (See id.) While the parties agree that previous incidents had occurred in the past, Plaintiff was unaware of those incidents on March 11, 2010. (See Docket Nos. 33 ¶ 122; 44 ¶ 122.) In fact, the previous incidents were not publicly known because the victims did not file any complaints or charges against Martinez Vargas. (See Docket Nos. 33 ¶ 125; 44 ¶ 125.) Two of Martinez Vargas' previous victims filed an administrative complaint against him after the March 11, 2010 events. (See Docket Nos. 33 ¶ 126; 44 ¶ 126.)

16

### E.    Effects of Martinez Vargas' Behavior on Plaintiff

17
18
19
20
21
22
23
24
25
26
27

Plaintiff sought treatment from the Workers Compensation Fund for seven months after the March 11, 2010 incident. (See Docket Nos. 33 ¶¶ 10-11; 44 ¶¶ 10-11.) After that time, the State Insurance Fund determined that, due to the intentional nature of Martinez Vargas' conduct, her condition was not covered by Puerto Rico's Workmen Compensation Act, so Plaintiff was required to seek private treatment. (See Docket No. 43-1 ¶ 12.) Ultimately, Plaintiff did not return to work after the incident. (See Docket Nos. 33 ¶ 12; 44 ¶ 12.) Plaintiff submitted a resignation letter on December 31, 2010, citing health and transportation problems, as well as Defendant's denial of her unpaid leave of absence request. (See Docket No. 39-5.) In her resignation letter, Plaintiff stated she would take advantage of the voluntary retirement option offered by Defendant. (See id.) Plaintiff's resignation was accepted by Defendant effective December 31, 2010. (See Docket Nos. 33 ¶¶ 16-17; 44 ¶¶ 16-17.)

28

Civil No. 11-2195 (GAG)

### F.    Defendant's Policies Regarding Sexual Harassment

The largest area of dispute between the parties revolves around the existence of Defendant's policy against sexual harassment.  Defendant claims the Personnel Regulation has a section devoted to sexual harassment.  (See Docket No. 39-8 at 3.)  The parties dispute whether the policy adequately defines sexual harassment, whether the policy was in place at the time of the March 11, 2010 incident and whether the leaflets were displayed at the old police station, as opposed to the current police station.  What is clear from the record is the following: Article 19 of the Municipality of Arecibo's Personnel Regulations for Career Employees is devoted to sexual harassment.  (See Docket No. 39-8 at 3.)  This document, dated in 2003, contains a description of the potential consequences for violating the policy.  (See id.)  While the current Regulations of the Arecibo Municipal Police Department contain a section regarding sexual harassment, the court has not been furnished with a copy of the regulations in effect at the time the events took place and, therefore, the court cannot rely on them as proof that such a regulation existed at the time.  (See Docket No. 39-9.[2]) Additionally, the parties disagree whether Defendant provided its employees with information regarding how to protect themselves from sexual harassment and whether such leaflets were posted around police headquarters.  (See Docket Nos. 33 ¶¶ 21-22; 44 ¶¶ 21-22.)

### III.    Discussion

Title VII prohibits employers from discriminating "against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  There are various types of actionable sexual harassment claims under Title VII: *quid pro quo* harassment claims, hostile work

---

[2]  Defendant's exhibit is dated in the year 2010, but does not contain an exact date of enactment.  Plaintiff points to her own deposition (Docket No. 44-1 ¶ 17) and Candelaria's deposition (Docket No. 44-1 at 9) to support her position that the regulations were enacted after the events of March 11, 2010.  Defendant denies the allegation, but does not cite any evidence that supports its denial.  The court cannot determine this factual disagreement and assumes the regulations were enacted after the pertinent events.

**Civil No. 11-2195 (GAG)**

environment claims, and retaliation claims.  See <u>Valentin-Almeyda v. Muncipality of Aguadilla</u>, 447

F.3d 85, 94 (1st Cir. 2006).  Plaintiff's remaining claim is a hostile work environment claim.

> To state a viable Title VII hostile work environment claim, a plaintiff must marshal sufficient

facts to demonstrate:

> > (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

<u>Forrest v. Brinker Intern. Payroll Co., LP</u>, 511 F.3d 225, 228 (1st Cir. 2007) (quoting <u>Crowley v.

L.L. Bean, Inc.</u>, 303 F.3d 387, 395 (1st Cir. 2002)).  Defendant argues that Plaintiff fails to

demonstrate the fourth element, the severe and pervasive standard, and the sixth element, that the

employer should be held liable.

> **A.   Severe or Pervasive Harassment**

> The court does not dwell on whether Martinez Vargas' behavior was so severe as to establish

an abusive working environment.  There is neither a dispute as to the events of March 11, nor that

Martinez Vargas' behavior was lewd, perverse and vulgar.  Whether this rises to the level of creating

an abusive working environment is a determination the court need not make because the court finds

Plaintiff has failed to establish Defendant's liability.  It is worth noting, however, that in cases such

as this, the determination is unusually difficult.  For one instance to be sufficiently severe to create

an abusive working environment, the plaintiff usually must meet a very high standard.  See <u>Clark

County School District v. Breeden</u>, 532 U.S. 268, 271 (2001) (holding "isolated incidents (unless

extremely serious) will not amount to discriminatory changes in the terms and conditions of

employment.") (internal quotation marks omitted) (citations omitted).  Instances such as rape are

sufficient to meet this very high burden.  See <u>Ferris v. Delta Air Lines, Inc.</u>, 277 F.3d 128, 136 (2d

Cir. 2001).  This case cannot be analogized to rape.  Plaintiff was never touched, threatened, or felt

threatened by physical contact.  On the other hand, Plaintiff was subjected to behavior that

potentially created an abusive working environment.  A co-worker, one she would eventually have

**Civil No. 11-2195 (GAG)**

to interact with, treated her with disgusting behavior at work.  While no employee should be subjected to this kind of behavior at the hands of a co-worker, Title VII does not protect against all forms of distasteful behavior.  Fortunately, the court need not make a determination in this case.

### B.     Employer Liability

Plaintiff must demonstrate some basis for employer liability in order to hold Defendant liable for Martinez Vargas' behavior.  This standard is higher than when the alleged harasser is a supervisor.  "When it is a supervisor that creates an actionable hostile work environment, the employer is vicariously liable." Gerald v. Univ. of P.R., 707 F.3d 7, 19-20 (1st Cir. 2013) (citing Arrieta-Colon v. Wal-Mart Puerto Rico, Inc., 434 F.3d 75, 86 (1st Cir. 2006)).  However, in cases such as this, when the harassment comes from a co-worker, the employer is liable when "the employer 'knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate action.'" Arrieta-Colon, 434 F.3d at 85-86 (citing L.L. Bean, 303 F.3d at 401).

The EEOC guidelines regarding sexual harassment in the workplace are instructive on this point of law.  See 29 C.F.R. § 1604.11.  The guidelines state, "With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action."  29 C.F.R. § 1604.11(d).  The guidelines continue by lauding the effectiveness of prevention, stating:

> Prevention is the best tool for the elimination of sexual harassment.  An employer should take all steps necessary to prevent sexual harassment from occurring, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under title VII, and developing methods to sensitize all concerned.

29 C.F.R. § 1604(f).  First Circuit precedent and EEOC guidelines present the clearest picture of when an employer is liable for a co-workers conduct.

### i.     Whether Defendant Knew or Should Have Known

The parties agree Defendant had no knowledge of Martinez Vargas' prior offensive conduct.

10

**Civil No. 11-2195 (GAG)**

1   Plaintiff was able to identify four other female officers Martinez Vargas' treated in a sexually

2   offensive manner; however, none of these victims ever informed any supervisor or authority of the

3   behavior.  The facts demonstrate that two of these victims actively sought to remain unidentified and

4   refused to give testimony that would advance Plaintiff's claims in this case.  The other two victims

5   never informed any supervisors of their encounters with Martinez Vargas and only filed a complaint

6   with the police after the March 11, 2010 incident.  Plaintiff has not adduced any evidence that

7   Defendant or any supervisor working in the police force knew, or should have known, of Martinez

8   Vargas' lewd conduct.  What the evidence does demonstrate is a coordinated effort by the victims

9   to keep quiet regarding Martinez Vargas' behavior, so as to not cause any issues within the

10  department.  It is Plaintiff that claims one of the previous victims confided in Candelaria and

11  Candelaria told no one else of the incident.  It is clear Defendant had no knowledge of Martinez

12  Vargas' behavior, nor should it had known of his behavior, prior to the events of March 11, 2010.

13              **ii.      Whether Defendant Took Prompt or Appropriate Action**

14          Next, Plaintiff must demonstrate Defendant failed to take prompt or appropriate action.  It

15  is here the court finds Defendant instinctively of protected its employees from gross and offensive

16  behavior.  The officers driving Plaintiff from the Coliseum to the station asked her what happened

17  and what was wrong.  Clearly they were tipped off from her coded conversation with Candelaria,

18  but Casablanca and Reyes knew something was amiss.  Upon learning such information, the two

19  officers sought out Avila, a supervisor, to remedy the situation.  After meeting and detailing the

20  morning's events, the Chief of Field Operations notified the state police and initiated both a criminal

21  and administrative investigation.  Hours after the incident, both Plaintiff and Martinez Vargas were

22  stripped of their service weapons, Plaintiff was interviewed by state police investigators, probable

23  cause was found and criminal charges were filed against Martinez Vargas.  Five days later, Martinez

24  Vargas was summarily suspended during the pendency of the investigation.  A notice of intent to

25  terminate and administrative charges followed on October 7, 2010.  Martinez Vargas was terminated

26  on April 6, 2011.

27          These actions were both prompt and appropriate under the given circumstances.  Under these

28                                                      11

Civil No. 11-2195 (GAG)

1    facts, it is difficult to attack Defendant's reaction.  Probably due to this difficulty, Plaintiff does not

2    attack the actions of Defendant as insufficient or untimely.  Instead, Plaintiff attacks Defendant's

3    inability to prevent this offensive conduct by not having an appropriate sexual harassment policy in

4    place.  In its opposition to summary judgment, Plaintiff places the burden on Defendant to

5    demonstrate its policy against sexual harassment was sufficient and in compliance with current legal

6    standards.  Failure to so demonstrate, Plaintiff alleges, requires the court to deny Defendant's motion

7    for summary judgment.  (See Docket No. 41 at 9.)  To reach this, Plaintiff relies on the EEOC

8    guidelines that state the best way to eliminate sexual harassment in the workplace is to prevent it.

9    See 29 U.S.C. § 1604.11(f).

10        The court cannot agree with Plaintiff's characterization of governing law.  As stated above,

11   an employer is liable when an employer knows or should have known of the conduct and did not

12   take prompt or appropriate action.  Plaintiff fails to address the fact that Defendant had no

13   knowledge of Martinez Vargas' previous acts.  Plaintiff also fails to address whether Defendant's

14   reaction, once informed of Martinez Vargas' behavior, sufficiently met the prompt and appropriate

15   standard.  The standard is not how Plaintiff describes it: one that requires an employer to take "all

16   necessary steps to prevent sexual harassment from occurring."  See 29 U.S.C. 1604.11(f).  Rather,

17   as the court describes, the standard is whether Defendant knew or should have known of the

18   harassment and whether Defendant took prompt and appropriate action.

19   **IV.    Conclusion**

20        The court is not insensitive to the grotesque and despicable acts Plaintiff suffered.  Certainly,

21   Martinez Vargas' behavior was inappropriate and unacceptable.  However, the court must analyze

22   Plaintiff's claims in light of governing law.  Title VII does not protect against such behavior.

23   Plaintiff may have valid state-law causes of action, but such were not before this court.  In sum, at

24   the summary judgment stage, Plaintiff must demonstrate a genuine issue of material fact.  Under the

25   facts of this case, Plaintiff fails to do so.  It is uncontested that Defendant did not know of Martinez

26   Vargas' prior behavior.  It also cannot be reasonably contested that Defendant took swift, appropriate

27   action to not only stop Martinez Vargas from harassing Plaintiff in the future, but also any other co-

28

**Civil No. 11-2195 (GAG)**

worker of the police force.  It is for these reasons, the court **GRANTS** Defendant's motion for summary judgment (Docket No. 35).

**SO ORDERED**

In San Juan, Puerto Rico this 23rd day of April, 2013.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

United States District Judge

13